**UNITED STATES of America ex rel. Robert CORBIN**

v.

**William J. BANMILLER, Warden, Eastern State Penitentiary, Philadelphia, Pennsylvania.**

**Misc. No. M–1983.**

United States District Court
E. D. Pennsylvania.

June 2, 1960.

Jerome E. Ornsteen, James E. Beasley, Philadelphia, Pa., for relator.

Frank B. Boyle, York, Pa., for respondent.

KRAFT, District Judge.

The relator in this application for writ of habeas corpus is presently imprisoned in the Eastern State Penitentiary, Phila-

delphia, Pa., under a sentence of life imprisonment imposed in 1951 by the Court of Oyer and Terminer of York County, Pa., after a jury had returned a verdict of guilty of murder in the first degree and had fixed that penalty.

Relator filed his amended petition for this writ on October 22, 1959, and respondent was ordered to show cause why the writ should not issue. Respondent, by the District Attorney of York County, filed an answer denying the material averments of the amended petition.

Thereafter hearings were had and both sides submitted evidence, oral and documentary. In addition, there is before us the complete transcript of the trial proceedings.

The murder was committed in the City of York, York County, on the evening of April 14, 1950. The victim was last seen alive at about 7:25 that evening. Her body was discovered about 9:45 the following morning. The perpetrators themselves were the only eyewitnesses, but the Commonwealth's pathologist fixed the time of death as about 9:00 p. m. Relator and two others were arrested, questioned and later indicted. One of the defendants, Genevieve Heistand, pleaded guilty and testified against the relator. Hers was the sole testimony which directly connected relator with the crime. The third defendant, Harold Albright, tried after the relator, was found guilty of murder in the second degree.

Relator's defense was an alibi. He testified that on the evening of the homicide he was in Sechrist's Cafe—one block distant from the scene of the crime —from about 7:00 or 7:30 o'clock until about 1:00 o'clock the next morning, and that he did not leave the cafe during that interval. Throughout the entire proceedings—from the time of his arrest until sentence—relator was represented by Norman T. Petow, Esq., who, at that time, had been actively engaged in practice in York County for some eighteen years. Mr. Petow was originally employed by members of relator's family and was compensated by them for all of his work preceding the actual trial. He was appointed by the Court to represent respondent at his trial and in subsequent proceedings.

Relator's first and main contention is that he was denied the right to effective counsel. The core of his complaint is that "counsel denied him the right of adequate representation by refusing to subpoena witnesses who could have testified that relator could not have been at the scene of the crime since he was seen at another location at the time." It is further alleged that some of these persons were in the courtroom during the trial, but counsel refused to call them to testify.

Both relator and his sister, Mrs. Babner, testified before us that they gave Mr. Petow the names of several persons who could and would support the defense of alibi. Our own view of the trial transcript discloses that two of those so named did testify—and that their testimony was of no benefit to the relator. It should be pointed out here that the jury might well have doubted the bona fides of relator's defense because of a circumstance referred to in the opinion of the trial judge refusing relator's motion for a new trial (Respondent's Ex. D):

"As a practical matter the factor which militated most against defendant's defense of alibi was the testimony of his own sister whom defendant identified as one whom he saw in Sechrist's Cafe where he testified he spent the whole evening the night of the tragedy. When called by defendant the sister testified that she had been employed at Sechrist's Cafe at the time but that she was not working on the evening in question and was at her own home all evening."

As to certain other names mentioned by relator and his sister as prospective alibi witnesses, Mr. Petow denied that those names were ever given him. He testified that he sought out and interviewed every person whose name had been given him and whom he was able to locate; that he made full inquiry at

Sechrist's Cafe, but received no information of any value; that it seemed "nobody was going to be involved in it". Mr. Petow further stated: "There were other people whom he gave and whom I interviewed and none of them, except members of his family, knew anything about Corbin's participation in the crime. And I was convinced that the only thing that they wanted me to do was to suborn perjury and assist them in telling them what they had to testify to."

We are not impressed by the testimony of either relator or Mrs. Babner. It appears that relator was a frequent visitor at Sechrist's Cafe. However, when he was asked at his trial whom he saw at the cafe during the period of five or six hours he was allegedly there on the night of the murder, he named but three persons,—a Mrs. Wolf, Mrs. Babner (his sister) and one Paul Ward. Mrs. Wolf testified at the trial. Mrs. Babner testified, but denied being at Sechrist's on the night in question. As for Paul Ward, neither relator nor his sister testified that his name was given to counsel as a possible witness.

It appears that Mr. Petow was originally retained to represent relator in the latter part of May, 1950. Relator testified before us that from then until his trial, which began January 2, 1951, he saw Mr. Petow on only three occasions,—"One time about 15 minutes, another time about 10 minutes and another time a half hour." On the other hand, Mr. Petow testified that after his first contact with relator he saw relator twice a week; that he instituted a habeas corpus proceeding on relator's behalf which was heard by two judges en banc, and resulted in relator's remand for trial; that he was in the York County Prison with relator practically the entire weekend immediately preceding the trial. This last statement of Mr. Petow was corroborated by Frank B. Boyle, Esq., the present District Attorney of York County, who then represented relator's accomplice, Genevieve Heistand. In response to a question by the court,

Mr. Boyle stated: "I would testify that I was present at the York County prison on Saturday afternoon, most of Saturday afternoon and all day Sunday, that is the Saturday and Sunday preceding the trial, with Mr. Petow, much of the time in the presence of Mr. Corbin, during which time Mr. Corbin was confronted by Mrs. Heistand, and also during which time preparations were continually underway for the defense of Mr. Corbin by Mr. Petow."

Relator's testimony is entitled to little or no credence. Apart from the manifest inconsistencies and contradictions in his testimony at different times, relator exhibited astonishing and incredible lapses of memory. He had absolutely no recollection of the habeas corpus proceeding, and recalled only with the greatest difficulty, and after persistent prodding, the confrontation by Genevieve Heistand.

██ We have examined the entire trial transcript with a care proportioned to the gravity of relator's complaint. It is our considered judgment that Mr. Petow conducted relator's defense with conspicuous and outstanding ability. We can add nothing to what the Supreme Court of Pennsylvania so well said in its opinion affirming the dismissal of relator's petition for writ of habeas corpus (Commonwealth ex rel. Corbin v. Banmiller, 1958, 391 Pa. 265, 271, 137 A.2d 467, 471):

"Appellant also appends to his petition eight statements, seven of which relate to his whereabouts on the evening of the murder, and the eighth relating to a statement allegedly made by Genevieve Heistand apparently to one of her co-prisoners. Three of the persons whose statements are appended did in fact appear at the trial and testified in appellant's behalf. As to the other five, there is not the slightest indication in the record that their testimony was offered at any stage in the proceedings. Appellant was defended by an attorney of over 18 years' experience. The court below

characterized the defense as vigorous and capable, and indeed our reading of the record confirms this observation. An indication of counsel's vigor is the fact that 48 jurors were called on voir dire before a jury was empanelled, and 150 pages of testimony were taken in that connection. The trial lasted four days, about 250 pages of testimony were recorded of which some two-thirds consisted of direct and cross-examination by the defense counsel. Appellant himself testified at length, witnesses were called by him to establish an alibi, and he called witnesses to refute the Commonwealth's case. There is no merit to his contention pressed here over five years after trial that he was denied the opportunity or the means to call witnesses at his trial."

Relator's next contention refers to "new evidence". His petition has attached to it a statement by one Dorothy Mitchell of a conversation she had with Genevieve Heistand prior to relator's trial, while both women were confined in the York County Prison. Dorothy Mitchell (now Feeser) appeared and testified before us. She testified that Genevieve expressed a personal feeling for relator, and said she was going to implicate him in the murder with Albright and herself. According to this witness, Genevieve also declared, "If I can't have him (Corbin) nobody else will have him, and I will implicate him in it if I have to lie to do it." It is asserted that, while this conversation took place before relator's trial, no knowledge thereof was acquired until long afterwards.

■■ It is too clear for discussion that relator's remedy on this score is not by way of habeas corpus, which is directed to such basic and fundamental unfairness or irregularity in the trial as amounts to a denial of due process. By the provisions of the Act of April 22, 1903, P.L. 245, 19 P.S. § 861 et seq., the Commonwealth affords the relator an appropriate remedy.

■ Relator's final complaint is that he was subjected to "cruel and unusual punishment," in that he was interrogated over a period of four months at all hours of the day and night, and in many cases in repeated sessions during the same day; that he was shuttled from one State Police barracks to another for extended periods, and during said periods was denied the right to contact counsel, or parents or friends.

A complete answer to this contention is found in the opinion of the Supreme Court of Pennsylvania, supra, which said (391 Pa. 265, 270, 137 A.2d 467, 470):

"As to his own detention, petitioner does not relate in what particular it was improper or irregular, but only insists that he was innocent of the crime of which he was convicted. The trial notes of testimony reveal that petitioner was picked up by the York city police and by the State Police, and questioned on several occasions for varying periods of time, on the murder charge and a bad check charge, but no irregularity appears. If any improper incarceration prior to trial had occurred, it should, of course, have been the subject of a habeas corpus petition at that time. This is not a case where under duress or illegal incarceration a forced confession was elicited from the petitioner. On the contrary, he steadfastly asserted his innocence, and no confession or admission was introduced against him.[2] The indictment, ·trial and sentence of petitioner afford a proper basis for appellant's current imprisonment, and no ground for granting his habeas corpus petition appears.

"2. Except as may be inferred from the evidence of one of the investigating officers who testified that upon being confronted by Genevieve Heistand and her accusation, appellant replied: 'Jenny, I didn't tell on you, why did you tell on me?' "

Accordingly we enter the following

Order

Now, June 2nd, 1960, the order to show cause is now vacated and relator's petition for writ of habeas corpus is dismissed.